15.4193 Kathleen Swank v. CareSource Mgmt Group Corp. Oral argument amounting to 3.15 minutes for 5. Mr. John Myers, please call the roll. Morning, Your Honors. Counsel, may it please the Court, I'm John Myers. I represent Katherina Swank, the appellant in this matter. I've reserved 5 minutes for rebuttal. You may. We're here on an appeal of denial of motion, granting of a motion for summary judgment for the defendant in this matter. Ms. Swank argues that she was disabled, and the District Court found that. I don't know if there's any dispute that she was disabled in this matter. The question is, in the District Court's analysis, Ms. Swank argues that she was otherwise qualified, despite her disability. The Court found otherwise. And if that's not the case, Ms. Swank went on to argue that if a non-essential job function were eliminated, she could have performed the job. And finally, that with the proposed reasonable accommodations, she could have performed the job. This report found against Ms. Swank in each of those. Against this backdrop, there's an issue as to whether Ms. Swank and CareSource, particularly CareSource, engaged in a good-faith interactive process in determining whether Ms. Swank could or should have been afforded an accommodation, or whether she could have performed the job without accommodation. Your argument now is based on the argument not that she was considered to be disabled, but that she was disabled. She was disabled, but I think the regarded as... The regarded as. That comes into play also, Your Honor. If you look... I understand, but I was having trouble from your brief understanding whether you were arguing that in the alternative, or whether you were arguing that she was only disabled by virtue of her being regarded as disabled, that she was actually able to do the job. No, and I understand... Without accommodation. That seemed to be what... I... If it was argued in the alternative, it was hard to tell when in your brief you switched to the alternative. I agree with you, Your Honor. It was a little bit inartful drafting there. I'm sorry? There was some inartful drafting there, but if you look at it, she was disabled. We're arguing from that point. You're arguing from the perspective that she was disabled, not just regarded as disabled. Correct. I mean, I understand regarded as disabled is defined as disabled, but you're saying she was disabled... Disabled. Disabled, not only regarded as disabled. Correct. And I think the confusion comes into play when she originally asked... when she was offered the job. She had worked for CareSource for a period of time. CareSource went to a new model because they entered into a contract with the Ohio Department of Job and Family Services. That model changed the role that she played, or she would play. In that job, it was termed a mobile position. As a case manager in a high-risk model, she supervised a team of other individuals that could perform face-to-face visits. The question here is, could she perform that job function and could she conduct face-to-face visits? Her concern was her ability to drive long distances. With rheumatoid arthritis, her ability to... the issue regarding infectious disease. Those issues were discussed at the beginning when she was offered the position. And as far as the infectious disease issue was concerned, that was resolved. We're personal protective gear. The interactive process proceeded and CareSource had her fill out a questionnaire. She filled out the questionnaire. Her doctor filled out the questionnaire. And therein lies a critical point here. What did that questionnaire say? And from that, what did CareSource glean as to whether she could perform the job with or without reasonable accommodation? If you look at that questionnaire in its entirety, Ms. Swank stated that she would have difficulty performing major life functions. Now, does difficulty performing major life functions equate to substantially limit? I think that's an issue of fact. And if you look at her doctors... Now you're talking about whether she was disabled or not? No, I think... No. Life functions goes to whether she was disabled or not. Correct. But if you look at whether she could perform with or without, if she could perform... If you look at what her job is and what she could do. Right. Not what her life functions are. Well, correct. If you look at the job functions, if you look at the doctor's opinion, the doctor didn't say that she couldn't perform the job functions. The doctor said that it would affect her ability to perform. I'm just struggling with the record, because everybody here understands that Ms. Swank was trying to work through the process in a way that would enable her either to keep that job or find a job that she can do. Right. My concern is the clarity in the record that we have to rely on, that we are bound by. And for Dr. Hedge... Hagee. Hagee, that works for me. I understood that she said she'd have difficulty performing, but didn't the doctor's statement say that she was not aware of any accommodation that would effectively address Swank's limitations and that Swank would be precluded from traveling during acute flare-ups? And didn't Swank respond by sending an email that said, the doctor doesn't think this new job is for me? She did. That was an email to her husband. But that's the plaintiff's statement. I'm struggling with what's in the record and how you can say that the doctor would be saying that she could perform it when the doctor says, I know of no accommodation that would make this job work. But the doctor said, if you look at the doctor's questionnaire in its entirety, at one point the doctor was asked, would her disability or medical condition affect her ability to get to work, travel to and from work? He said, yes, during acute flare-ups. But didn't Ms. Swank testify that there were times that she would have acute flare-ups? Yes, but does that preclude her from performing essential functions of the job? Under the ADA, leave is an accommodation that can be afforded. And that was addressed early on, prior to submission of the questionnaire. Didn't they say she could do that? And yet we followed with, she had at least ten conversations, didn't she, with the person in charge about how to make an accommodation work? I guess my bottom line concern is her testimony in response to, is it Sharfin? Sharfin. Thank you. That she could not perform the essential functions of her job with or without an accommodation. That was on May 21, 2012. That was the final event. It is the final. That was a termination conversation. Prior to that, if you look at the interactive process, from my reading of the record, there doesn't appear to be a point in time when CareSource told her, we can't accommodate you. We don't feel that you can perform the job with or without a reasonable accommodation. If she agrees with that, that's the record by which we are bound, isn't it? If the plaintiff herself says, I can't perform this job with or without a reasonable accommodation, doesn't that govern her claim? No, it doesn't. It creates an issue. Why not? Look at the doctor's testimony. If you look at CareSource, CareSource relies on the doctor's testimony. The doctor being Hedgie? Correct, Your Honor. If you look at Hedgie's opinion, and you read that in its entirety, Hedgie never says that she cannot perform the job. She cannot perform the job during flare-ups. If that were the standard, that an employee, if they're disabled, and can't perform during periods of time when there was a flare-up in their condition, it would limit a substantial number of people in being employed. With leave as an accommodation, during the flare-ups, CareSource said early on that wasn't a problem. Take leave. That was lost in the process. When you say it was lost in the process, does that mean that she didn't assert that later on? Because it would seem that her position at best, you would say, okay, I'll take this job. It's just I'll be sick some of the time, but not beyond what's permissible. Then they could have talked about whether that was good enough or not, but I didn't see that she raised it that way. She didn't raise it that way. CareSource, when they contacted the doctor, never spoke to the doctor. They spoke to an assistant in the office. They clarified that she was going to have flare-ups. There was nothing in the record as to the frequency of the flare-ups. I think that creates the issue of fact between her understanding of what the doctor said and her abilities versus what the doctor actually said. Do we rely on the doctor or the individual? Here, the doctor forms an opinion. CareSource relies on that opinion. There's testimony that their HR department relied on that opinion in determining whether she could perform the essential functions of the job. Could I ask a question about how this was litigated? Because I understand that your brief has four points, one, two, three, and four. Yes. What you're arguing today is point four, right? You're not waving, I'm sure. I'm not waving. You're not presenting arguments one, two, and three. You're presenting right now, this morning, four. Is that correct? Yes, but the interactive process plays into each of those arguments. Well, I understand, but this is the fourth. And the lower court treated this as an argument that wasn't adequately raised, right? The interactive process, yes. Right. So there's nothing wrong with doing it this way, but it kind of suggests that maybe the major arguments aren't as strong as the minor arguments, which is not a very, you know, I think that's a little part of the reason that we're struggling here. You know, we look at these briefs and we think, oh, main argument, secondary argument, third argument, fourth argument that arguably, at least, wasn't even raised below. And maybe it was raised technically, but it wasn't the thrust of what was going on below. Isn't that fair? But now it's become, all of a sudden, the main thing, the main part of your argument. It's not quite bait and switch, but it's a little bit like the focus is different. I wouldn't agree that it's bait and switch. No, I'm not saying it was, but a little bit of that flavor. But if you look at the focus of how a company or an employer determines whether an accommodation is to be afforded, that interactive process is crucial. And each stage of that, there are facts that are gathered that the employer utilizes in making determinations. Well, that's fair. Thank you. Okay, thank you, counsel. You'll have your time to rebuttal. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, my name is Drew Campbell. I'm appearing on behalf of the Appellee Care Source. I'm also joined at counsel table by Care Source's General Counsel, Mark Chilson. Your Honors, every written statement that the appellant made in this case confirmed that she was unable to perform the essential functions of her job. The District Court relied almost exclusively on her own testimony and on her written statements when it concluded that she failed to meet the standard under summary judgment for critical elements of her claim of discrimination against Care Source. The District Court was correct and we're asking that you would affirm the Court's decision. In early 2011, the Ohio Department of Jobs and Family Services concluded that 60% of its expenditure on the Medicaid population was being spent on 1% of the sickest group of those people. They came to Care Source as a managed care provider and mandated that they create a high-touch community-based model to make sure that these people receive the services they need to make sure they were getting medical care and getting healthy. Care Source surveyed the literature and created a program that recognized that their professionals would have to go door-to-door, face-to-face, in person to meet with the sickest of their members to make sure they were having coordination of the care that they needed. That became part of the contractual obligation between Care Source and ODJFS. It meant completely restructuring their delivery model and it meant creating a new job called RN, High Risk Case Manager. Now this changed the world for Ms. Swank. Ms. Swank testified accurately that she knew that people would have to go face-to-face because, quote, sometimes it's hard to assess a patient without actually seeing them. She also testified she understood that this meant that going forward the nurses would have to be mobile, her words. And she recognized that she, as an RN, would have an obligation to make some of these visits because she was credentialed to perform some of the services that Care Source was required to provide. But the problem, of course, was her rheumatoid arthritis. She understood that because she would have to drive, it was difficult for her because she would have to sit for long periods of time. Because she would meet face-to-face with the sickest population, she recognized that might compromise her autoimmune system. And because she would be exposed to the weather, that was also an issue with respect to her rheumatoid arthritis. And that was why she testified that of all the jobs that Care Source had, this was the last job that she wanted. She requested an accommodation. It was a five-month process that involved four employees at Care Source. They gave her a temporary assignment that relieved her from the obligation to perform any of the mobile functions while they considered whether this job could be done by her. They ultimately concluded that it could not. And, unfortunately, here we are. What happened to the early discussions of accommodations that appeared to have been granted, that she could wear a face mask for the infectious disease issues and that they could work with her on travel or her flare-ups because she could request family and medical leave. According to Ms. Swank's testimony, which we will accept is true, she met with several Care Source personnel on November 11th of 2011 to discuss that point, and she claims that those are the accommodations she requested. On November 14th, 2011, she sent an email to Pam Tropiano, a vice president at Care Source, Swank Deposition Exhibit 15, where she said, despite those accommodations, quote, sending me into an environment where I'm in contact with the highest risk patients would be detrimental to my health. December 28th, 2011, she submits her written request for an accommodation where she says, quote, unable to tolerate being exposed to changes in weather conditions, quote, unable to sit, stand for long periods of time. And she checked a little box saying the disability was permanent. And she herself testified that the word unable meant she was physically incapable of doing it. I would suggest that what she may be recognizing was the mere fact that she might be assigned patients closer to home didn't mean she wouldn't have to sit for long periods of time to get there. And clearly, it also meant she would have to stand as part of her job duties. What happened to the family and medical leave option? It just appears to disappear from the record. Well, it's not an option that she requested. Your Honor, I don't think it's an option. I thought it was an option that early on was the company's response. We can make this work. And then I don't see the family and medical leave option discussed again. That was not the testimony with respect to her engagement with folks in connection with her request for the accommodation. The issue that she really confronted, and I think that she acknowledged this in her deposition, was there was simply no accommodation that was ever going to address the issues that she had because of her rheumatoid arthritis. Your position is she abandoned that offer. I think that's right, Your Honor. She never pursued that, and I don't think that would have made a difference. In fact, we heard some discussion earlier about the report of Dr. Hegde, whether Dr. Hegde's report actually confirmed that she was unable to perform these functions. Well, the testimony was that there was follow-up, and the follow-up confirmed that when Dr. Hegde talked about flare-ups, the flare-ups were unpredictable, both with respect to their frequency and their duration. And so it was impossible to predict, in Ms. Swank's case, how often she would be unable to perform these job duties. And Ms. Swank testified that at every meeting with Carisaurus, she was told that this job would require up to 50% of her time traveling. And so with that amount of time spent on critical functions, meeting with the Carisaurus members, the inability to predict her attendance was a very serious problem. In fact, this court held in EEOC v. Ford Motor, an en banc decision from last April, that regular attendance in the appropriate circumstance is an essential job function, and how much so here, where her job as a registered nurse was to go perform in-person assessments of the medical condition of these members to make sure they were getting the services they needed. So what is your response to her claim that there were other job positions available that she could have completed all the essential functions? That claim is not supported by the record. In fact, what the record really said, if you look at the transcript of Lynn Wertheim, who I think addressed this in the most detail, in Northeast Ohio, where Ms. Swank was located, all of the positions that were available there were traveling positions. They were mobile positions. Each position would require... The Cleveland ones were too far away. That relates to her supposed refusal to move. It was the Dayton one, wasn't it? Well, there were positions in Dayton that were unrelated to her current position that she had never requested. There was no testimony in the record that she was willing to relocate. In fact, the only record testimony was the contrary. Christy Goldshot-Jones testified that she had been advised by her superiors that Ms. Swank was not open to relocation. But with respect to the jobs available in Northeast Ohio, they would all require her to travel. They would all require her to meet with the sickest 1%. And I think Ms. Wertheim's testimony was that even those positions that were placing people in-house were already filled, and so there really weren't any opportunities for her in the Northeast Ohio area, which is where she lived. With respect to the FMLA leave, am I right about this? This was something that was discussed early on before all the job functions were concretized, but she did not request it once the functions were concretized. She didn't say that would be an accommodation. That's exactly right. That's exactly right. And just to follow up on Judge Strachan, your last question, there was nothing in the record that suggested that Ms. Swank ever asked for or applied for these other positions. There was some conversation, but she never actually applied for them. But getting back to some of the— I took the thrust of the district court opinion was that she couldn't drive. That doesn't seem to be what you're relying on now very much. Well, mobility was one of the—that was the issue the court focused on, and that was a critical issue because her testimony was that she was unable to— Why is it focusing on that and you're not? Well, I am focusing on that, but I'm also saying that the record supported these other two points as well. The district court's point was if you can't sit for long periods of time, it doesn't matter how close the assignments are, you may be stuck in traffic. You may be stuck in weather. In fact, Ms. Swank testified of that herself. She said there was no accommodation that would guarantee that even a shorter travel time wouldn't— Did she indicate that she couldn't drive? Yes, she said she was unable. Drive. Yes, and her words were unable. And it was necessary for her to drive was the position of the employer. Yes, it was a policy of the employer. That would—it wouldn't seem like you even need to get into all those health problems. If she can't drive and she needs to drive, they have to find an accommodation that will have someone else drive for her, I guess. That wasn't suggested, I suppose. Yes, it's a good point, and the district court footed its decision narrowly, but there are other aspects of the record that equally support the court's decision with respect to the disability. And to your earlier— There was some discussion in the record of her being at the top of a team of people and that sometimes the driving and the face-to-face visits could be performed by the other team members that she could assign. But I understand that she also admitted that there were times that only the RN could do it. Right, and I think that's a critical point. Each team member had a different role, and so it was anticipated that they would all travel. Some traveled as much as 90 percent of the time. She was a registered nurse, and so there were particular clinical issues that only she could address and certain things only she could do. The testimony of her team lead, Jamie Humphreys, was to the effect that where there were critical circumstances, which would be common with the 1 percent of the population, her requirement for travel might be every single day. They may be meeting with the same patient over and over. Only she could perform some of those functions. Those could not be delegated to others. Your Honors, there has been discussion today about the interactive process. And Judge Rogers, to your point, the argument the district court said was waived. The treatment and the appeals brief doesn't really say where in the complaint this was raised, but I think it's important to talk very briefly about what the record really said about the interactive process. Four people over the course of five months considered her request. Her own testimony was that she talked to Ms. Kasson at least ten times, and her testimony was that during that time they spoke extensively about the accommodation. CareSource provided her with a temporary position so that she would be relieved of the obligation to travel while it made this consideration. Ms. Scarfpin actually had two conversations with her, not one. She had one in March, and her testimony, which was not contradicted, was that she went line by line through the job description and asked her, could she perform this with or without an accommodation? And each time Ms. Swank said no. The second conversation that took place in May, the conversation where she was terminated, Ms. Scarfpin again asked her, can you perform this job with or without an accommodation? Again, she said no. Every statement that Ms. Swank made to her employer was to the effect that she was unable to perform these essential job functions. Employers are entitled to give weight to what their employees say. In fact, the testimony was not that CareSource looked solely to the medical provider to make these determinations. Ms. Scarfpin and Ms. Goldshot-Jones both testified. They looked at what both say. The employee's statement about whether the employee believes they can perform the job function is very, very important to this process. They considered both. Every word that Ms. Swank had on this topic was to the effect that she was unable to perform these essential job functions, job functions that were mandated by the contract that CareSource had with the Ohio Department of Jobs and Family Services. Your Honors, we think that the District Court's decision was very carefully drafted. The Court focused solely on the statements that she made and the written documents that she signed and footed its decision, Judge Rogers, to your point, on a narrow footing. But there were other things in the record that supported it as well. And so we ask that the Court affirm the decision of the District Court. Thank you, Counsel. Thank you. You have five minutes for rebuttal. Thank you, Your Honors. Judge Rogers, let me look at the issue of mobility that was addressed. There's testimony that in Ms. Swank's position, she would have to travel up to 50% of the time. But there's nothing in the written record that the documents produced by CareSource, their policy and procedure manuals, their day in the life of a case manager high risk, or in the job description that sets forth the amount of time she would have to travel. It said reasonable travel. And this is important because one of the individuals that Ms. Swank in her role could delegate duties to was a navigator. In the navigator position, the testimony, they were referred to as road warriors. They were on the road 90% of the time conducting face-to-face visits. There's also nothing in the record that sets forth when an RN would have to conduct a face-to-face visit. The State didn't mandate that RNs conduct face-to-face visits. Didn't Ms. Swank testify that she recognized that there were instances in which only an RN could deal with these patients? Yes, but that also ties into the issue of one of the accommodations she requested, that she be assigned members in her geographic area near her home. Christy Goldschott from the HR department testified that she did consider that. But when Ms. Swank was assigned to a team, she was assigned to Lorain County. She had patients in Lorain County. She lived in Portage County, Kent, Ohio. There's a substantial distance there. During that period of time, that three months where she didn't have to drive, there was a period where she performed as a case manager high risk. Her face-to-face visits were delegated to another individual, not an RN. It was a non-clinical individual on the team. So what did she ask for as an accommodation to the limits on her driving? To be assigned to an area closer to her home, in a geographic area near her home. Did she say that wasn't enough at some point? My reading of the record is she didn't say that was enough. She said that if she was assigned to that, she could do it. That's what she asked for. I thought by the time that she was asking for an accommodation, she couldn't drive. She wanted something where she wouldn't have to drive. At least that she wouldn't have to drive whenever she was having one of these sudden attacks or whatever it was that she was subject to. That was never resolved. But there was a discussion that on the days that she, this was early on in the November-December conversation, on the days that she couldn't drive or do a face-to-face visit, that those face-to-face visits could be assigned to another individual, another R.N. That's in the record. That's from Christmas. That part of the discussion after the request for an accommodation. It was prior to, but the request for an accommodation. The change when she asked for an accommodation seemed like she was wanting more than she was willing to accept earlier, and the company ought to be able to deal with that, shouldn't they? I mean, this is what you're asking for now, and we can't do that. As I read the record. Give us something else, and there's nothing else. As I read the record, her position was consistent throughout. In her deposition testimony, she repeatedly testified that she didn't say she couldn't drive. She recognized she'd have limitations. The question is, what was done with that? Ms. Goldshot, who ultimately made a recommendation as to whether Ms. Swank could perform the essential functions of her job based upon Ms. Swank's input and the doctor's input, said she formed the opinion before she got the doctor's recommendations. So at that point, early on in the process, the November-December timeframe, Ms. Goldshot determined that Ms. Swank could not perform the essential functions of the job. If you look at Dr. Heggie's opinion also, he lists leave as a possibility to accommodate her. That is in there. So that issue was raised not only early on in the process by Ms. Swank and care source individuals, but also by the doctor. That was dropped. Were there other RNs on the team? You said if she couldn't do it on some day, some other RN could. Were there other RNs on her team or in general on teams? Yes, there were. There was a team lead, and then that team lead supervised a number of RNs, who then in turn had individuals under them that would conduct face-to-face visits. So yes, Your Honor, there were other individuals that could do that. The question is, would that create an undue hardship for care sorts? That wasn't addressed. I see my time is up. Thank you, Your Honor. Questions? Thank you. That case will be submitted, and the clerk may call the next.